PER CURIAM.
Appellant, Diversified Mortgage Investors (DMI), appeals a final judgment entered against it in favor of Viking General Corp. (General) and Viking Mobile Homes, Inc. (Mobile Homes).
In June 1975 HNC Mortgage & Realty Investors (HNC) filed an action to foreclose a first mortgage on a mobile home park. HNC joined Mobile Homes, Viking Communities Corp., and 119 Properties, Inc. as the owners of the property and General as an interest holder in the property. The second mortgage holder, Exchange National Bank (Exchange), and the third mortgage holder, DMI, were also joined. Appellees General and Mobile Homes answered and filed a cross-claim against DMI alleging that DMI breached its obligation to fund future advances under the terms of the third mortgage and commitment thereby causing the foreclosure action by HNC.
Following trial the court awarded HNC a judgment of foreclosure and approved HNC’s stipulation not to seek a deficiency judgment. The court also awarded judgment for Exchange against General on its note and for DMI against Mobile Homes on its note. On the cross-claim the court awarded judgment against DMI for the following:
1. debt due HNC (this item of damages was mooted by HNC’s stipulation not to seek a deficiency);
2. the debt due Exchange ($504,183.37);
3. the debt due DMI ($759,558.99);
4. loss of land value of the mobile home park, in excess of the aforementioned debts ($325,000);
5. attorneys’ fees ($45,000); [and]
6. court costs ($3,632.38).
The court set off DMI’s judgment and awarded General and Mobile a net judgment against DMI of $877,815.75. The property was sold at a foreclosure sale and a certificate of sale was issued in the name of HNC at a bid price of $2,126,041.62.
The first mortgage and note held by HNC were executed by General July 9,1972 and modified March 28, 1973. The note called for monthly payments of interest with principal payments due beginning August 1977 or upon acceleration at the declaration of the mortgagee.
The second mortgage was executed March 28,1973 between Exchange and General. The Exchange mortgage provided for annual payments of principal and interest of approximately $100,000, the first of which was due in March 1974 and the second in March 1975.
On December 14, 1973 DMI issued a loan commitment to Mobile Homes. The commitment was for a third mortgage loan in the amount of $650,000 with a provision for future advances in the event of default by Mobile Homes in the maximum amount of $2,250,000. Mobile Homes paid a $39,000 commitment fee. The maximum amount of any future advances was the sum of the two prior mortgages, the $1,750,000 HNC mortgage, and the $500,000 Exchange mortgage. By the terms of the commitment, DMI’s obligation to make future advances expired one year from the date of the loan closing unless extended by Mobile Homes. On December 21, 1973 Mobile Homes executed a $650,000 promissory note and third mortgage to DMI pursuant to the terms of the commitment letter. Contemporaneous with the execution of the note and mortgage, a loan agreement was also entered into by the parties.
The first default under the HNC loan occurred September 1, 1974 when interest due for August 1974 went unpaid. A default in principal occurred when the principal balance of approximately $1,750,000 went unpaid after acceleration on June 4, 1975.
The second annual installment of principal and interest under the Exchange note *736 was not made when due in March 1975. Prior to the March 1975 default, the only default under the $500,000 Exchange note was failure to pay $17,500 interest due March 1974. Appellees contend that the $17,500 was a default in payment of the principal although Wayne Smith, the vice president of Exchange in charge of the loan, testified that the default was in interest. The default in the March 1975 principal and interest payments resulted in acceleration of the Exchange loan on May 27, 1975.
Since Mobile Homes did not pay the additional fee necessary to extend the term of the commitment, the obligation of DMI to make future advances expired as of December 21, 1974. By this date, both prior loans were in default for the payment of interest, but no acceleration had occurred. Therefore, there were no principal payments overdue on either loan.
In its final judgment the trial court ruled that:
On the cross claims of VIKING GENERAL CORP. and VIKING MOBILE HOMES, INC., the Court finds that the terms of the contractual agreements are conflicting and ambiguous, but considering all documents and considering all evidence of the intent of the parties, it is clear that the wrap-around or stand-by committment [sic] was for protection against a default in the prior mortgages, either for principal, interest, or other default or any combination thereof.
The first issue raised by appellant is dis-positive of this appeal, that is, whether the instruments describing the agreement between DMI and Mobile Homes included a commitment to pay defaults in principal and interest or in principal only. We hold that under the terms of the agreement between the parties DMI was obligated to fund a default in principal only. There is no document which specifically requires DMI to cure defaults in the payment of interest. The commitment letter and the loan agreement clearly state that DMI is obligated to pay principal only and could at its option pay the HNC and Exchange mortgages in full.
Commitment letter:
21. Future Advances:
(a) Obligation of Lender to Disburse: If there is an act of default, at any time and from time to time, during the first twelve (12) months after the closing of the Loan, in either or both of the prior mortgages referred to in Paragraph A.19 of this Commitment, Lender shall disburse out of the reserve described in Paragraph 11(B) of Exhibit “B” of this Commitment the payment of principal as same comes due on the mortgage which is in default and, at the option of lender, may pay off either or both of said prior mortgages in full, (emphasis added).
Loan agreement:
52. FUTURE ADVANCES:
(a) Obligation of Lender to Disburse: If there is an act of default, at any time and from time to time, during the first twelve (12) months after the closing of the Loan, in either or both of the prior mortgages referred to in paragraph A.19 of the Commitment, Lender shall disburse out of the reserve described in paragraph 2.A. of Exhibit “E” of this Agreement the payment of principal as same comes due on the mortgage which is in default and, at the option of Lender, may pay off either or both of said prior mortgages in full, (emphasis added).
Appellees argue however that as to the extent of DMFs obligation to make the payments required on the two prior mortgages the loan documents are ambiguous and in conflict with one another. The basis for their argument is found in paragraph 17 of the DMI mortgage. That paragraph was obviously incorporated into the mortgage document from paragraph 10 of the com *737 mitment letter. Both paragraphs are quoted below:
Commitment letter:
(c) The aforesaid third mortgage which secures the loan shall provide the following:
“Notwithstanding any prints ed terms and provisions herein contained, the mortgagor shall maintain in good standing all superior liens and encumbrances upon the real property. Upon the failure of the mortgagor to maintain such encumbrances in good standing, the mortgagee shall have the right to cure any defaults by making the defaulted payments or by paying said encumbrances in full. . . .
Mortgage:
Notwithstanding any printed terms and provisions herein contained, the mortgagor shall maintain in good standing all superior liens and encumbrances upon the real property. Upon the failure of the Mortgagor to maintain such encumbrances in good standing, the Mortgagee shall cure any defaults by making the defaulted payment or by paying said encumbrances in full. . . ,
The fact that the critical phrase “have the right to” is omitted from the mortgage reflects the possibility of a clerical error. This would also explain what otherwise appears as an unorthodox method of setting forth an obligation of the mortgagee to make future advances in a document signed only by the mortgagor. If the key words had not been deleted the provision would simply describe the manner in which the mortgagee could protect itself against defaults in prior liens.
Be that as it may and assuming the existence of ambiguities, the documents include, a cure for any conflict among them by providing that the terms of the loan agreement shall have priority.
Commitment letter:
in the event of a conflict between the Loan documents and this Commitment, the Loan documents shall control.
Loan agreement:
in the event of a conflict between any of the provisions of the Mortgage and this Agreement, the provisions of this Agreement shall control.
in the event of a conflict between the Loan Agreement and other loan documents and the Commitment, the Loan documents shall control.
Mortgage:
. in the event of any conflict between the terms and provisions of this Mortgage instrument and the said Loan Agreement, it is agreed that the Loan Agreement shall control.
Promissory note:
If there is any conflict between the Note and said Mortgage or Loan Agreement, the terms and conditions of the Loan Agreement shall control.
The appellees’ contention that the loan agreement is not a loan document and is therefore subordinate to the terms of the mortgage under the second quoted provision of the loan agreement fails because of the inclusion of the word “other” to modify the words “loan documents.” It is the loan agreement then which controls, and it clearly limits DMI’s obligation to fund defaults in principal.
Thus, we hold that because there was no default in principal during the period DMI was obligated to make advances under the agreement, DMI did not breach the agreement and cannot be held liable on the cross-claim. The judgment against DMI is reversed, and the case is remanded for such further proceedings consistent with this opinion as may be necessary.
BOARDMAN, C. J., and McNULTY and GRIMES, JJ., concur.